# United States District Court

—— ❈ ——

# Southern District of New York

—— ❈ ——

PHILLIP CARR,

*Petitioner,*

*v.*

MICHAEL KIRKPATRICK, SUPERINTENDENT,
CLINTON CORRECTIONAL FACILITY,

*Respondent.*

## MEMORANDUM OF LAW IN SUPPORT OF VERIFIED PETITION FOR A WRIT OF HABEAS CORPUS (28 U.S.C. § 2254)

Robert S. Dean
Center for Appellate Litigation
*Attorney for Petitioner*
120 Wall Street, 28th Floor
New York, NY 10005
212-577-2523

September 22, 2020

Matthew Bova (5073135)
mbova@cfal.org
*Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

SUMMARY OF ARGUMENT .......................................................................2

STATEMENT OF FACTS..............................................................................7

The Trial Evidence.......................................................................................7

A. The November 16, 2009 courtyard shooting. .......................................7

B. The objective forensic evidence—gunshot-residue testing—proved Mr. Carr's innocence. ............................................................................11

C. A drug-dealing family agrees to testify against Mr. Carr in exchange for the nullification of over half-a-century of prison exposure. ................12

D. The 2012 Trial...................................................................................15

   1.  The forensic evidence introduced at trial confirmed innocence...................15

   2.  The cooperators testify to save themselves from serious prison time. ........16

   3.  Counsel fails to redact a judge's declaration, in the cooperation-plea transcripts, that Mr. Carr was guilty of the shooting and was dangerous...................................................................................19

   4.  Defense counsel emphasizes the plea transcripts in his summation. .........20

   5.  The jury reviews the unredacted plea transcripts during deliberations and then returns a guilty verdict.................................................21

State-Appellate Proceedings .......................................................................22

ARGUMENT: This fundamental breakdown in advocacy requires habeas relief.....24

A. Governing Standards...........................................................................24

B. Counsel's blunders were quintessential deficient performance.............................28

C. Counsel's grave blunders worked serious prejudice to the defense......................29

   1.  De Novo review applies. ...............................................................29

   2.  Under either de novo or deferential review, Mr. Carr can establish prejudice................................................................................31

i.   These judicial declarations of guilt were gravely prejudicial....................32

ii.  The State's case was underwhelming and had serious problems. .............34

    a. The Gunshot-Residue Evidence.................................................35

    b. The cooperators had serious credibility problems. ................................36

    c. The State had no motive evidence. ...........................................39

    d. Evidence that Mr. Carr ran from the sound of gunfire and
       discarded a hoodie had virtually no probative value. .............................40

iii. The judicial declarations of guilt/dangerousness rendered
     this proceeding fundamentally unfair........................................41

D. The writ should issue......................................................................41

CONCLUSION ..................................................................................42

# TABLE OF AUTHORITIES

## Cases

*Banks v. Dretke,* 540 U.S. 668 (2004) ................................................................36

*Clay v. United States*, 537 U.S. 522 (2003) ...........................................................2

*Earls v. McCaughtry*, 379 F.3d 489 (8th Cir. 2004)...........................................29, 33

*Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003) ...............................................24, 28

*Floyd v. City of New York*, 959 F.Supp.2d 540 (S.D.N.Y. 2013)................................40

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005)................................................35

*Greene v. Fisher*, 565 U.S. 34 (2011) ...............................................................27

*Harrington v. Richter*, 562 U.S. 86 (2011)................................................... passim

*Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005)..........................................................26

*Hinton v. Alabama*, 571 U.S. 263 (2014).......................................................24, 28, 29

*House v. Bell*, 547 U.S. 518 (2006)....................................................................39

*Jones v. Calloway*, 842 F.3d 454 (7th Cir. 2016) ........................................................31

*Kyles v. Whitley*, 514 U.S. 419 (1995) ........................................................................39

*Lafler v. Cooper*, 566 U.S. 156 (2012) ........................................................................26

*Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001) ...................................................2, 28

*Mendez v. Artuz*, 303 F.3d 411 (2d Cir. 2002) ...........................................................39

*Mosley v. Atchison*, 689 F.3d 838 (7th Cir. 2014) .....................................................31

*O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) ..............................................................41

*On Lee v. United States*, 343 U.S. 747 (1952) ...........................................................36

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ..................................................................24

*Panetti v. Quarterman*, 551 U.S. 930 (2007) .............................................................27

*Parker v. Gladden*, 385 U.S. 363 (1966) ....................................................................32

*Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) ...........................................................29

*People v. Cummings*, 31 N.Y.3d 204 (2018) ..............................................................34

*People v. Shutsha,* 151 A.D.3d 657 (1st Dept. 2017) ..................................................29

*Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam) ...............................................31

*Rosario v. Ercole*, 601 F.3d 118 (2d Cir. 2010) .........................................................25

*Rosen v. Superintendent Mahanoy SCI*, 2020 WL 5035798
   (3d Cir. Aug. 26, 2020) ..........................................................................................27

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................................. passim

*United States v. Baylor*, 2011 W.L. 5910061 (E.D. Va. Nov. 28, 2011) .....................37

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) ....................................25, 31

*United States v. Reyes*, 18 F.3d 65 (2d Cir. 1994) ......................................................37

*Usher v. Ercole*, 710 F.Supp.2d 287 (E.D.N.Y. 2010) ...............................................28

*Wiggins v. Smith*, 539 U.S. 510 (2003) .......................................................................24

*Williams v. Artuz*, 237 F.3d 147 (2d Cir. 2000) ............................................................2

*Williams v. Taylor*, 529 U.S. 362 (2000)........................................................26, 30, 31

*Wilson v. Mazzuca*, 570 F.3d 490 (2d Cir. 2009)....................................25, 31

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012)...............................................26

## Statutes

28 U.S.C. § 2244 ................................................................................................2

28 U.S.C. § 2254 ........................................................................................ passim

C.P.L. § 440.10 ...............................................................................................29

C.P.L. § 470.15 ...............................................................................................22

## Other Authorities

Beety, *What the Brain Saw: The Case of Trayvon Martin and the Need for Eyewitness Identification Reform*, 90 Denv. U.L. Rev. 331 (2012) ..................38, 40

Cutler, *A Sample of Witness, Crime, and Perpetrator Characteristics Affecting Eyewitness Identification Accuracy*, 4 Cardozo Pub. L. Poly. & Ethics J. 327 (2006)....................................................................................................38

Franklin & Greenstein, *A Brief Guide to Factors That Commonly Influence Identification and Memory of Criminal Events*, 85 N.Y. State Bar J. 10 (March/April 2013) .......................................................................................38

Hagen & Yang, *Criminal Defendants Have a Due Process Right to an Expert on Eyewitness Reliability: Why the Court Was Wrong in Perry v. New Hampshire*, 26 S. Cal. Interdisc. L.J. 47 (2016)............................................................38

Judge Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381 (1996)...................................................36

Means, Federal Habeas Manual (2020 ed.) ..............................................27

Stuart, *Becoming "Copwise": Policing, Culture, and the Collateral Consequences of Street-Level Criminalization*, 50 Law & Soc'y Rev. 279 (2016) ..........................40

Yankah, Op-Ed., The Truth About Trayvon, N.Y. Times, July 16, 2013...................40

## Constitutional Provisions

U.S. Const. amend. VI.............................................................................2, 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHILLIP CARR,

    *Petitioner*,
   v.

MICHAEL KIRKPATRICK,
Superintendent, Clinton Correctional Facility,

    *Respondent*.

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION FOR A WRIT OF HABEAS CORPUS

### PRELIMINARY STATEMENT

Petitioner Phillip Carr petitions this Court under 28 U.S.C. § 2254[1] to vacate a New York State judgment (rendered on July 20, 2012 in Bronx County Supreme Court) that convicted him of second-degree murder, attempted second-degree murder, and related charges, and sentenced him to an aggregate sentence of 25 years to life in state prison (Donnelly, J., at trial and sentence). Mr. Carr is currently incarcerated at Clinton Correctional Facility under that judgment.

---

[1] This memorandum occasionally refers to § 2254(d)(1) as "AEDPA."

The Appellate Division, First Department, affirmed the judgment on January 22, 2019. *See* Petitioner's Annexed Appendix 1-5 ("A"). The Court of Appeals denied leave to appeal on July 1, 2019. A1190.[2]

Mr. Carr now argues, as he did before the New York courts, that counsel's failure to redact trial exhibits—which contained a judge's declaration that he was guilty of the charged homicide and was dangerous—constituted ineffective assistance of counsel. U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984).

## SUMMARY OF ARGUMENT

This habeas petition involves an unprecedented and "amazing dereliction" by defense counsel in a murder trial. U.S. Const. amend. VI; *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001) ; *Strickland v. Washington*, 466 U.S. 668 (1984). Due to pure carelessness, counsel failed to object to the admission of the unredacted plea transcripts of the State's witnesses. Those unredacted transcripts contained a judge's declaration that Mr. Carr was *guilty* of the charged offenses and was dangerous. These devastating blunders stained this verdict, undermining confidence in the trial's outcome and rendering the trial fundamentally unfair. *Harrington v. Richter*, 562 U.S. 86, 110 (2011); *Strickland*, 466 U.S. at 693-96.

**\* \* \***

---

[2] This petition is timely filed as it has been filed within one year after the judgment became final—that is, within one year of September 29, 2019, when Petitioner's time to seek United States Supreme Court review expired. 28 U.S.C. § 2244(d)(1)(A); *Clay v. United States*, 537 U.S. 522, 527 (2003); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2000).

At 8:36 p.m. on November 16, 2009, an individual fired several shots at a group in an apartment-building courtyard in the Bronx. The shooter was wearing a hoodie over his head and fired from at least 100-feet away. The shooting killed one individual and injured two others. Amongst the group was a family of drug dealers: Natalie Santiago, her son Angel Rivas Junior, and her nephew Alvin Ortiz. Natalie's ex-husband, Angel Rivas Senior, was shot that night but recovered.

Several minutes after the shooting, 17-year-old Phillip Carr was arrested outside of a schoolyard about two blocks from the apartment-building courtyard. The police claimed they saw him running in that large schoolyard after shots rang out. The NYPD's laboratory performed gunshot residue testing on a hoodie that Mr. Carr had discarded in the schoolyard, finding none. The State never developed any theory about why this high school student would fire at a group of drug dealers.

Almost a year after the courtyard shooting, the three members of the drug-dealing family who were in the courtyard that night (two cousins [Ortiz and Rivas Jr.] and their mother/aunt [Santiago]) were charged in a 55-count indictment with serious narcotics felonies. The two cousins were also indicted, in late 2010, for attempted-armed assault, stemming from their joint effort to shoot a woman.

During the ten months following the shooting, the drug-dealing-family members never told anyone they saw the shooter, let alone that they could identify a hooded man at night from more than 100 feet away. But a year later—collectively facing over 65 years in prison and searching for a deal—they now claimed they knew a lot. They

alleged that the shooter was the teenager the State had been holding in custody, Phillip Carr.

The two cooperating cousins agreed to lay the blame on Mr. Carr in exchange for significant benefits. Facing more than 50 years in prison for at least seven serious felony charges lodged in numerous indictments, the two cousins agreed to testify against Mr. Carr in exchange for *zero* jail time.[3]

Santiago, who was facing felony-narcotics charges and the prospect of her son's lengthy incarceration, also agreed to cooperate against Mr. Carr. On the very day she accused Mr. Carr, her son was released from Rikers Island and offered the sweetheart deal summarized above. Further, under the express terms of her son's plea agreement, if she failed to cooperate, her son would lose his no-jail deal. And finally, Santiago pled guilty on the 2010 narcotics indictment in exchange for a conditional dismissal of the narcotics charges. At the time of Mr. Carr's trial, she was awaiting sentence on that plea and thus had every reason to accommodate the State's desires.

At the 2012 homicide trial, Mr. Carr had a powerful defense: the three cooperators, all conveniently blessed with the ability to identify a hooded man from more than 100 feet away at night, were lying to save themselves from serious prison time. Further, the forensic evidence—a negative gunshot-residue test—proved innocence.

Unfortunately, defense counsel's egregious blunders effectively deleted this powerful defense from this case. Due to sheer laziness, defense counsel failed to

---

[3] Under their agreements, the cooperating cousins had to plead guilty to the outstanding narcotics and armed-assault indictments. *See* Plea Transcripts: Attached Appendix 6-66 ("A").

redact the cousins' plea transcripts, which were admitted into evidence and reviewed by the jury just before their verdict. Exs. 64 and 67: Attached Appendix 6-66 ("A"). Those unredacted transcripts contained damning statements from the plea judge. In Angel Rivas Junior's transcript, the plea judge expressly warned Angel that cooperation would be dangerous because Mr. Carr was *guilty of the charged offenses*— that is, Mr. Carr had "already killed somebody and shot two other people." A48. The judge also repeatedly stated that cooperation against Mr. Carr "may be very dangerous" and that there was "risk involved, perhaps very serious risk involved in your undertaking cooperation in these circumstances." A48.

The judge made a similar point in the other cousin's transcript, warning Ortiz that testifying against Mr. Carr "may involve certain danger" and asking if he was "prepared to put [him]self at risk with respect to this agreement." A23-A24.

About 90 minutes after the jury received these unredacted transcripts during deliberations, the jury convicted Mr. Carr of murder, attempted murder, and related counts.

Before the Appellate Division, Mr. Carr contended that counsel's devastating failure to redact these exhibits was ineffective assistance of counsel under *Strickland*. The Appellate Division held that "as the People concede, remarks by the plea court that could be viewed as expressing an opinion on this defendant's guilt and the dangers of testifying against him should have been redacted." A2. The court then held that Mr. Carr could not show that counsel's mistakes "affected the outcome of the case. Specifically, defendant has not shown that the verdict would have been different

even if counsel" had ensured the transcripts were properly redacted. A4-5. A Judge of the Court of Appeals subsequently denied leave to appeal on July 1, 2019. A1190.

This timely petition for a writ of habeas corpus follows.

**\* \* \***

This Court should grant the writ. The Appellate Division's adjudication of Mr. Carr's ineffective-assistance claim was "contrary to, [and] involved an unreasonable application" of the Supreme Court's clearly-established decisions. 28 U.S.C. § 2254 (d)(1); *Strickland*, 466 U.S. at 687-88, 694-96.

Counsel's patently deficient performance worked serious prejudice to the defense. *Strickland*, 466 U.S. at 693-96. Assuming one could imagine a case where these damning judicial declarations—the functional equivalent of a directed verdict—did not prejudice the defense, this case certainly isn't it. Here, the *objective* scientific evidence—the negative gunshot residue test—exculpated Mr. Carr. And the State's witnesses had grave and obvious credibility problems. Unfortunately though, the jurors could not fairly assess the evidence because counsel's ineffective representation allowed them to read a judge's damning declarations of guilt and dangerousness. No "fairminded jurist" could have confidence in the outcome of this fundamentally unfair trial. *Harrington v. Richter*, 562 U.S. 86, 101 (2011); *Strickland*, 466 U.S. at 693-96; 28 U.S.C. § 2254 (d)(1).

Accordingly, the writ should issue so a new trial can be held. At that new trial, a jury can fairly decide this case without first reading a judge's fundamentally-unfair declarations that Mr. Carr is guilty and dangerous.

6

## STATEMENT OF FACTS

### The Trial Evidence

#### A.  The November 16, 2009 courtyard shooting

On November 16, 2009 at 8:36 p.m., a man wearing a hoodie fired seven shots from the sidewalk into an apartment-building courtyard. That courtyard was located at 2000 Prospect Avenue in the Bronx, between 178th and 179th Streets). *See* A477; Map (Ex. 3): A1209; Computerized Diagram (Ex. 55): A1213.[4] That shooting killed Felix Delvalle and injured two others, Marlene Pro and Angel Rivas Senior. A492, A497-98, A532.

The two photographs below (entered into evidence at trial)[5] depict the courtyard at 2000 Prospect Avenue:



Ex. 18. Depicting the courtyard from the 2000 Prospect Avenue gate (A1211).

---

[4] All exhibits ("Ex.") cited in this memorandum are State trial exhibits.

[5] A1211-12, A1214-15.

7



Ex. 19. View of the gate from the middle of the courtyard (A1214)

At the time of the shooting, four related individuals were in the courtyard: (1) Angel Rivas Senior, (2) his ex-wife Natalie Santiago, (3) their son Angel Rivas Junior (19 years old), and (4) Alvin Ortiz (18 years old and Angel's cousin). A622, A631, A632, A658, A701. Alvin had recently arrived at the apartment building days earlier having just left a "juvenile facility." A624.

During the shooting, these individuals were hanging out at the far end of the courtyard, about 100-feet from the gated entrance.[6] Additionally, many of the group's friends and family were also there, including the cousins' friend Felix Delvalle. A632; A706 ("a lot" of people were in the courtyard); A761-63.

---

[6] A602-03, A633, A638, A707, A710, A761; Diagram (Ex. 55): A1213 (indicating that the length of the alley leading into the courtyard is 43 feet and the remaining distance to the far end of the courtyard, where the group was sitting, is 61 feet); Photograph of Courtyard (Ex. 18): A1211.

Vague black-and-white surveillance footage from a camera located outside the courtyard—which captured part of the sidewalk and the 178th/Prospect intersection—showed that during the 20 minutes before the 8:36 p.m. shooting, at least 20 people were walking on the street. At least five of them are wearing dark hoodies. Surveillance Video: Ex. 66.[7]

At 8:36 p.m., a hooded individual walked up to the courtyard's gate**.** *Id.* From there, he fired seven shots through the gate into the far-right corner of the courtyard, killing Felix Delvalle and injuring Rivas Senior and Marlene Pro. A498-500, A536, A604, A623. The shooter then ran north up Prospect Avenue towards 179th Street. A589.

The sidewalk surveillance footage did not depict the shooting because it did not depict the courtyard gate. Surveillance Video: Ex. 66. Instead, it showed a hooded man walking up to 2000 Prospect at 8:36 p.m. *Id.* That man disappears off camera (apparently approaching the gate) for ten seconds and then runs north. *Id.* Below is a snapshot from the video exhibit, which depicts the hooded individual running north:

---

[7] This exhibit will be supplied to the court in electronic form.



Responding to the sound of gunshots, NYPD Officer Santana (in a vehicle) saw a man in a hoodie a block away from the shooting running north through a large schoolyard. That schoolyard spans the Prospect Avenue block from 179th to 180th Street. A445-48, A466, Map (Ex. 3): A1209. When the officer shined lights on him, the man paused and pointed towards the shooting's location, saying, "They're shooting over there." A447-48.

Officer Santana proceeded to the shooting's location a block away. An anonymous woman who was driving through the intersection of 179th and Prospect said, "That's him with the black hoody running." She said he was "shooting over there" and pointed to 2000 Prospect Avenue. A449-53. There was no evidence that this person had seen the shooting.

The police then drove two blocks up to the schoolyard's exit, located on Mapes Avenue and 180th Street. A453-55; Map (Ex. 3): A1209. There, about five minutes after the shooting, they arrested Mr. Carr as he exited the schoolyard. A463, A468-

69. They frisked him and found no weapon. A468-69. Mr. Carr's DNA was found on a black "Champion" hoodie that had been discarded in the schoolyard. A839-45. The police never found any weapon linked to this homicide.

Upon his arrest, Mr. Carr made no inculpatory statements. Instead, when stopped by the police, he said that they were "shooting at his sister, Jasmine." A461. No evidence contradicted that statement.

### B. The objective forensic evidence—gunshot-residue testing— proved Mr. Carr's innocence.

Ballistics analysis confirmed that seven shots were fired from the same 9-millimeter firearm. A536, A565-70. After Mr. Carr's arrest, the NYPD forensic laboratory performed gunshot-residue testing on the discarded hoodie. A802-03. Gunshot residue primer will normally eject from a firearm when a bullet is discharged, landing on the hand or arm. A574-81. The ejected shell and/or gases emitted from the weapon's side (where the shell is ejected) will leave gunshot residue on the shooter. A574-77. "Gases [will] com[e] out of the gun, anywhere where there's a hole in the gun the gases would be coming out." A578. Thus, NYPD officers who have spent time at the shooting range will "very carefully wash" their hands to remove gunshot residue. A581.

Detective Scott-Rowe, an NYPD forensic analyst, examined 21 tape lifts, which removed particles from the inner and outer sleeves of the sweatshirt. A799-803; *see* A802 ("This a is a procedure that is used to remove trace evidence. . . . [A] piece of tape [ ] is rolled or rubbed along the surface of the item that you're analyzing or examining and the trace material will . . . stick to the tape. And this is what is

11

happening when you do a tape lift. You're actually removing the trace evidence and it's getting stuck onto the tape and this is collected and safeguarded."). Upon examining the tape lifts under a microscope, the detective "did not see any gunshot residue. Specifically wafers, which are one of the shapes that you would find gunpowder to be in. You would be able to see this under a stereo microscope if it was present on the tape. This was not present in the 21 tapes that I actually looked at under the microscope." A803.

### C. A drug-dealing family agrees to testify against Mr. Carr in exchange for the nullification of over half-a-century of prison exposure.

After the November 2009 shooting, Santiago and the cousins never provided any information about the courtyard shooting for almost a year. A660, A720-21, A732, A737, A769, A784-85. That changed in the late summer of 2010, however, when the family members were arrested and collectively facing over 65 years in prison for numerous felony charges.

In March 2010, the State charged Angel Rivas Jr. ("Rivas") with felony drug possession, which carried a nine-year maximum sentence. A63, A724. A few months later, the State again arrested Rivas for assaulting a woman. A723.

The arrests continued. In August 2010, the State arrested both cousins for attempted first-degree assault and weapon possession. A625, A628, A647-48, A722. These C-violent felony charges stemmed from Alvin Ortiz ("Ortiz") firing a weapon at a woman with Rivas' help. A647-48, A722, A743. For these charges, both cousins were facing at least 15 years in prison. A648, A724.

Weeks later, on September 9, 2010, the cousins and Santiago were arrested for

numerous B-felony drug sales. A625, A722, A770. This was the cousins' "second pending indictment working in cahoots" with each other. A745. The charges stemmed from the trio's participation in an "ongoing drug operation," which involved their "working together to sell drugs in the vicinity of [a] school." A642-43, A742. Each member of the family was arrested after making more than a dozen drug sales to undercover officers near a Bronx school. A625, A642-43, A741, A770-75.

In a joint indictment that involved at least nine co-defendants and 55 counts, the State charged each of the family members with B-felony narcotics sale. A22, A741-42, A775. Those counts each carried a maximum sentence of nine years in prison. *E.g.*, A643. Since they were charged with selling drugs in or near school grounds, they faced elevated punishment. *E.g.*, A643.

In sum, by September 2010, these three drug dealers were collectively facing more than 35 years in prison for their numerous felony-drug charges. And the cousins, detained on Rikers Island, were also each facing at least 15 years for attempted assault with a firearm. So, they sought a deal with the prosecutors, hoping to trade criminal accusations for no jail time. A625-27, A721, A725-26, A739-40. They turned their attention to the courtyard shooting that happened ten months earlier.

In exchange for their cooperation and testimony against Mr. Carr, the State expressly promised the cousins no jail time on their numerous drug-felony charges. A21, A644, A725**.** Ortiz would even evade felony convictions, only receiving misdemeanor convictions. A628-29, A644. The cousins would also be immediately released without bail from Rikers Island in exchange for their cooperation. A10, A45,

A649.

As for Santiago, the State secured her testimony against Mr. Carr by expressly requiring that she testify against Mr. Carr in order for her son to receive his deal. Rivas Plea Transcript (January 7, 2011): A44-46 ("[I]f you do fulfill your obligation, if this goes as planned and you *and Natalie Santiago* testify truthfully and cooperate fully in the case against Mr. Carr and others . . . you will be permitted to withdraw your previous pleas [and receive no jail time]") (emphasis added). And on the very day Santiago came forward in January 2011, her son pled guilty and was released from jail. A779.

The cousins also secured a deal nullifying over 30 years of prison exposure stemming from their attempted-armed assault and weapon-possession felony charges. In exchange for his cooperation against Mr. Carr, Rivas would receive no jail time for those violent-felony charges. A46, A724-25, A748. And in exchange for Ortiz' cooperation/testimony against someone named Dylan Matias in an unrelated attempted-murder case, Ortiz would receive the same benefit. A11-12, A626-28. The Matias incident occurred two months before the November 16, 2009 courtyard shooting in the same location. A8-9, A626.

The three cooperators all acknowledged that had they never been arrested, they never would have spoken to the police about the November 16, 2009 shooting cases. A626-27, A661, A770, A775.

The testimony of this trio of cooperators in hand, the State proceeded to trial in 2012, accusing Mr. Carr of the November 16, 2009 shooting.

### D. The 2012 Trial

#### 1. The forensic evidence introduced at trial confirmed innocence.

NYPD Detective Scott-Rowe, a forensic analyst, testified that her microscope-tape-lift analysis of the hoodie's sleeves was negative for gunshot residue. A803. She then offered a confusing explanation for why she declined to perform further testing for the presence of gunshot-residue chemicals. A801.

The analyst claimed that chemicals found in gunshot residue, such as "nitrites," are found in other substances, including "cured meat" or fertilizer. A800-01. So, the explanation went, the NYPD only performs gunshot-residue-chemical testing when a specific "bullet hole" can be linked to the tested area (such as in suspected suicide cases). A800-04, A808, A810, A814. Only then can the NYPD ensure that a positive test actually indicates gunshot residue and not, say, "cured meat." A800-01.

On some "occasions" in the preceding four years, Scott-Rowe performed gunshot-residue testing on a "defendant's clothing or shooter's clothing." A804. She did not find gunshot residue on those "occasions." A804, A814. The analyst never explained how many "occasions" she was referencing, let alone whether the negative results in those "occasions" were actually *false* negatives. A804, A814.

On cross, the analyst acknowledged that gunshot residue is comprised of barium, lead, and antimony. A811-12. But she could not explain why the NYPD would decline to test for these particular elements when trying to confirm gunshot residue's presence. Defense counsel pressed the analyst on whether gunshot residue was the "only item, if analyzed, that would result in all three of those items appearing together." A811-12. The analyst did not know. A811-12. The analyst insisted that although she is an NYPD detective, she is a "civilian there" and her "findings are independent." A819.

### 2. The cooperators testify to save themselves from serious prison time.

By the time of the 2012 trial, Ortiz and Rivas were awaiting sentencing on the pleas that they had entered in exchange for their cooperation against Mr. Carr and no jail time. *E.g.*, A6-66, A645, A790-91. Ortiz, who had been released after agreeing to cooperate, had already been rearrested for yet additional felony charges—another armed assault—and was held in Rikers Island without bail. A622, A629-30, A641.[8]

Ortiz had already testified against Matias in another case, thus securing his no-jail-time deal for shooting a woman (attempted first-degree assault and weapon possession). A628-29. If he refused to repeat the pattern by failing to testify against Mr. Carr, he would face nine years and a felony conviction under his narcotics-plea deal. A645. But if he testified against Mr. Carr, the prosecutor would report his cooperation to the sentencing judge and his misdemeanor/no-jail-time deal was "in

---

[8] The prosecutor led Ortiz to testify that he had been offered no deal on this third round of felony charges. A630. But it is inconceivable that Ortiz failed to realize he would receive harsh treatment if he refused to continue to cooperate against Mr. Carr.

the bag." A645.

Rivas, on the other hand, had been released a year-and-a-half before his testimony because he and his mother had agreed to cooperate. A44-46, A779. When asked whether there was "no way in the world [he would] pass up the opportunity to come in and try to convict Phillip Carr," Rivas couldn't even answer the question, vaguely answering, "I didn't try." A748-49. When defense counsel added, "Whether it's true or not," Rivas continued the combative posture, repeatedly stating, "Was you there[?]" A749.

Santiago testified that she had pled guilty to the 2010 narcotics charges in exchange for a conditional discharge that would result in dismissal. A771, A790-93. At the time of trial, she was awaiting sentencing on that plea and her sentencing had been repeatedly adjourned. A790-91. Santiago recognized that she "came forward" to try to "make a deal for [her] son," who had been arrested and was facing decades in prison. A771, A784.

These cooperators testified that—although it was night-time and the shooter was wearing a hoodie over his head—they knew the shooter was Mr. Carr, whom they knew from the neighborhood/school. A623, A634, A702-03, A760-62. The cousins never had any problems with Mr. Carr. A637, A704-05. They purportedly saw the hooded shooter walk up to the courtyard gate and fire through it. A633-35, A711-12, A765-66. When shots fired, the cousins dove into the basement while Santiago fainted. A633-36, A640, A711-13.

The cousins claimed they never discussed either the shooting or their deals with

17

each other. Ortiz: A657 (claiming he never once discussed the facts of the shooting with his aunt or cousin); Rivas: A736 (claiming he never spoke to his own mother about this shooting); Rivas: A730 and A736 (testifying in the June 2012 trial that he never spoke to his cousin about the November 2009 shooting until they were arrested 10 months later and had not spoken to him since then).

Santiago claimed she was out of the loop too. She never knew, at the time she agreed to cooperate against Mr. Carr in January 2011, that her own nephew had already entered into a cooperation agreement with the prosecution. A782. "I didn't even know nothing about that." A782.

The cooperators claimed the shooter's hoodie was black. *E.g.*, A766. But Yadira Maya, who was sitting nearby in her car during the shooting, told the police, that night, that the shooter's hoodie was blue. A593, A596-97. Yadira changed her testimony to "black" at trial because she talked to her sister, who was also sitting in the car, and "compared notes" with her. A593-94. Her recollection at the time of trial (more than 900 days after the incident) was "more clear" than it was on the night of the shooting. A597.

Rivas and Ortiz testified about the hoodie's brand. They claimed that they somehow discerned, from 100 feet away at night, that the hoodie was a "Champion" hoodie. A623, A634, A729. Ortiz never tried to explain how he could discern the hoodie's brand. But Rivas claimed it was "a black hoodie, you know what a, like Champion hoodie, it was all black. . . . Champion, like he had, like a hoodie with a cone top." A729. Rivas never explained why a cone top indicated a "Champion" hoodie.

The State introduced no evidence of any motive on Mr. Carr's part nor any evidence that he had any criminal record/narcotics involvement. The State also never introduced any evidence disproving the real possibility that this was a narcotics-related shooting, not a random act of violence by a 17-year-old high school student with no criminal record. Angel Rivas Senior, who was shot that night and had previously been shot at before, never cooperated with the police and did not testify. A672, A693-94, A698-99. No witness denied that Rivas Senior was a drug dealer, just like his cooperating family members. As even the prosecutor explained in summation, Rivas Senior's absence was "the elephant" in "the room." A913; *see also* Defense Summation: A884, A896.

### 3. Counsel fails to redact a judge's declaration, in the cooperation-plea transcripts, that Mr. Carr was guilty of the shooting and was dangerous.

The State introduced, as Exhibits 64 and 67, Rivas and Ortiz' plea transcripts into evidence. A6-66. Defense counsel consented to their admission. A627, A667, A739.

Those transcripts outlined the serious benefits Santiago and the cousins had received in exchange for their testimony. A6-66. Defense counsel repeatedly relied on these transcripts during cross-examination, informing the jury that it should look at them. Ortiz Cross: A642; Rivas Cross: A747 (counsel stated, "You know what? The jury can see the exhibit."). But defense counsel failed to move to redact inadmissible and gravely-prejudicial statements in those plea transcripts. *See* App. Div. Decision: A2.

The unredacted Rivas transcript indicates that the plea court[9] directed the proceedings "be conducted secretly," closed the courtroom, and ordered that the minutes be sealed. A38. The court told Rivas that cooperation "may be very dangerous" and that there was "risk involved, perhaps very serious risk involved in your undertaking cooperation in these circumstances." A48. The court then warned Rivas that Mr. Carr had already killed one man and shot two others:

> COURT: The individuals who are being prosecuted have already killed somebody and shot two other people. Do you understand that?
>
> ANGEL RIVAS: Yes, sir. A48.

The prosecutor[10] added that if Rivas felt "threatened," she would "relocat[e] him for his safety." A49.

The unredacted Ortiz transcript followed a similar theme. A6-36. Again, the judge warned Ortiz that testifying against Mr. Carr "may involve certain danger" and entailed "risks." A23-24. The court stressed, "I do not ask you to undertake any risks. I don't ask you to put yourself in danger. I will be guided by the agreement between counsel, but it's not my role to put somebody at risk. The question becomes, are you prepared to put yourself at risk with respect to this agreement[.]" A24.

### 4. Defense counsel emphasizes the plea transcripts in his summation.

In his summation, defense counsel argued that the cooperators were incredible because they were testifying in exchange for a "wonderful package deal." A889-95,

---

[9] Justice Steven Barrett was the plea judge but was not the trial judge at Mr. Carr's trial.

[10] The prosecutor at the Rivas and Ortiz pleas tried Mr. Carr's case.

A898-904. He repeatedly told the jury to look at the plea-transcript exhibits. A893-95, A900. "[R]ead the plea minutes," he said, adding, "Why did [they] pick him? Already in custody. [They] already knows he's the accused guy, and he's [their] ticket to freedom." A895.

Although Santiago had testified that she was not receiving any benefit in exchange for her testimony (A771, A791), defense counsel told the jurors to look at page 8 of her son's plea transcript (A44-46), so they could see that Santiago's cooperation was expressly tied to her son's freedom. A901.

### 5. The jury reviews the unredacted plea transcripts during deliberations and then returns a guilty verdict.

The court instructed the jury that it could review the plea-transcript exhibits during deliberations. A942, A961. The court told the jury to "carefully scrutinize" the cooperators' testimony because they had been promised a benefit in exchange for their testimony. A941-42.

After the final charge, both attorneys consented to the court giving the jury any requested exhibits without reconvening. A965. The court recessed for lunch. A965. The jury's first note, submitted at 1:40 p.m., requested "copies of the plea agreements." A1206. Their second note, submitted at 2:25 p.m., requested some photos and the surveillance footage. A1207. The third note, submitted at 3:40 p.m., said that a verdict had been reached. A1208.

After the recess, the first two notes were marked as court exhibits. The court explained, outside the jury's presence, that since they had previously agreed that

exhibits would go to the jury without reconvening, "all of those things went in with the consent of counsel." A966.

When the jury re-entered the courtroom, the court read the three notes aloud and then directed the clerk to take the verdict. A967-68. The jury convicted Mr. Carr of second-degree murder of Felix Delvalle; attempted second-degree murder and first-degree assault of Rivas Senior; second-degree assault of Marlene Pro; and second-degree criminal possession of a weapon. A968-71.

On July 20, 2012, the court sentenced Mr. Carr to an aggregate sentence of 25 years to life in prison. A975-88.

## State-Appellate Proceedings

Before the Appellate Division, Mr. Carr argued that the unredacted plea transcripts were inadmissible. He requested that the Appellate Division review this unpreserved claim in the interest of justice. A1034-42; C.P.L. § 470.15(6)(a) (authorizing review of unpreserved claims).

Alternatively, Mr. Carr argued that counsel's failure to redact the exhibits constituted ineffective assistance under the Sixth Amendment. A1042, A1062-68. The "fact that a court of law referred to . . . appellant as 'very dangerous' and as having 'already killed somebody and shot two other people' essentially directed a verdict of guilt in this case. Counsel's failure to see and avoid that was indefensible and itself a sufficient basis for reversal here." A1067-68.

The State "concede[d] that [the] minutes should have been redacted prior to being introduced into evidence." A1135. But the State argued that the jury's review of these

plea transcripts did not deprive Mr. Carr of a fair trial. A1135.

The Appellate Division held that "as the People concede, remarks by the plea court that could be viewed as expressing an opinion on this defendant's guilt and the dangers of testifying against him should have been redacted." A2. Nevertheless, the court declined to review the unpreserved claim in the interests of justice. A1-2. Alternatively, the court found the error harmless because "[e]yewitness identifications by the two cooperating witnesses and the mother of one of these witnesses were corroborated by strong circumstantial evidence." A2.

The Appellate Division further held that Mr. Carr "has not shown that any of counsel's alleged deficiencies fell below an objective standard of reasonableness, or that, viewed individually or collectively, they deprived defendant of a fair trial or affected the outcome of the case. Specifically, defendant has not shown that the verdict would have been different even if counsel had made all the objections defendant now faults him for failing to make, and if all of those objections had been successful." A4-5.[11]

Mr. Carr again sought review of his federal-ineffective-assistance claim before the Court of Appeals. A1168-73, A1179-84. A Judge of that court denied leave to appeal on July 1, 2019. A1190.

---

[11] Mr. Carr also argued before the Appellate Division that counsel was ineffective for, among other things, failing to preclude hearsay, object to certain summation comments, and advocate for his client at sentencing. A1064-73.

# ARGUMENT

## This fundamental breakdown in advocacy requires habeas relief.

Defense counsel's blunders here were egregious. Due to pure carelessness, counsel allowed the jury to read a judge's declaration that his client was guilty of the charged offenses and was dangerous. These fatal blunders undermine confidence in the outcome and render this trial fundamentally unfair. *Strickland*, 466 U.S. at 694-96.

### A. Governing Standards

Under *Strickland v. Washington*, counsel is ineffective if his deficient performance prejudices the defense. 466 U.S. 668 (1984); U.S. Const. amend. VI.

To show deficient performance, the defendant must establish that counsel's performance fell "below an objective standard of reasonableness." *Hinton v. Alabama*, 571 U.S. 263, 264, 273 (2014); *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010). Errors that are the result of "oversight, carelessness, ineptitude, or laziness" constitute deficient performance. *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).

To establish prejudice, the defendant must show a "reasonable probability" of a different outcome, defined as a probability sufficient to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. As a verdict must be unanimous, (*e.g.*, Jury Instructions: A961), defendant need only show "a reasonable probability that at least one juror would have" voted to acquit. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

Under *Strickland*'s prejudice standard, the "defendant need not establish that the attorney's deficient performance more likely than not altered the outcome." *Strickland*, 466 U.S. at 693. "[T]he reasonable-probability standard is not the same

as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *Wilson v. Mazzuca*, 570 F.3d 490, 507 (2d Cir. 2009) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n. 9 (2004)).

In assessing prejudice, courts must bear in mind that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, 466 U.S. at 695-96. Further, a verdict "only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 695-96.

Ultimately, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (the writ must issue when counsel's unreasonable mistake "was so fundamental as to call the fairness of the trial into doubt").

The quantity of counsel's errors does not control. A single and sufficiently-prejudicial blunder requires relief even if counsel's overall performance indicated "general competency." *Rosario v. Ercole*, 601 F.3d 118, 124-26 (2d Cir. 2010).

"[R]eliance on counsel's competency in all other respects fails to apply the *Strickland* standard at all." *Henry v. Poole*, 409 F.3d 48, 72 (2d Cir. 2005).[12]

A federal habeas court must issue the writ if a state conviction violates the federal constitution and 28 U.S.C. § 2254(d)(1)'s standards are satisfied. 28 U.S.C. § 2254 (d)(1) (the writ must issue when the "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"). Under 28 U.S.C. § 2254 (d)(1), when the state court applies the wrong constitutional standard—in violation of "clearly established" law—a federal habeas court reviews the claim de novo. *E.g.*, *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (when a "state court applies a rule that contradicts the governing law set forth in our cases," a federal court is "unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause"); *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (defendant, who went to trial, argued that counsel was ineffective for failing to reasonably advise him regarding a favorable plea offer; state court's determination that defendant could not secure relief because his decision to proceed to trial was "knowing and voluntary" was owed no deference because that standard violated *Strickland*); *Young v. Conway*, 698 F.3d 69, 84-85 (2d Cir. 2012) (application of the "wrong legal standard" violates the "contrary to" clause of § 2254(d)(1)); Means, Federal Habeas Manual, *Consequence of "Contrary To" Determination* § 3:50 (2020

---

[12] Alterations, brackets, and ellipses have been removed from this citation.

ed.) (available on Westlaw) ("A state court decision that is 'contrary to' clearly established Supreme Court precedent is reviewed under the pre-AEDPA de novo standard.") (collecting authority).

On the other hand, when the state court correctly identifies the controlling constitutional standard, the writ must issue if the state court unreasonably applied that standard. 28 U.S.C. § 2254 (d)(1). AEPDA "does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (citation and quotation marks omitted). "Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Id.* at 953 (citations and quotation marks omitted). The unreasonable-application analysis requires deference, not "abdicat[ion]" of judicial review. *Rosen v. Superintendent Mahanoy SCI*, 2020 WL 5035798, at *7 n. 83 (3d Cir. Aug. 26, 2020).

**\* \* \***

Under these standards, the writ should issue. The Appellate Division's determination that counsel was effective under *Strickland* was "contrary to, [and] involved an unreasonable application of, clearly established" Supreme Court jurisprudence. 28 U.S.C. § 2254(d)(1); *Strickland*, 466 U.S. 668; *see generally Greene v. Fisher*, 565 U.S. 34, 40 (2011) (under AEDPA, the federal court must assess the last state decision on the merits, here, the Appellate Division's January 22, 2019

decision).

## B. Counsel's blunders were quintessential deficient performance.

Counsel's "amazing dereliction[s]" were quintessential deficient performance. *Hinton*, 571 U.S at 264, 273; *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001). No reasonable attorney allows the jury to read a judge's declaration that his own client is guilty and dangerous. A23-24, A48-49; *see also* App. Div. Decision: A2 ("[A]s the People concede, remarks by the plea court that could be viewed as expressing an opinion on this defendant's guilt and the dangers of testifying against him should have been redacted."). These blunders were, without a doubt, the result of a lazy oversight—not a reasonable strategic call. *E.g.*, *Eze*, 321 F.3d at 112 ("[I]f certain omissions cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness, we would find the quality of representation sufficiently deficient to grant the writ."); *see also*, *e.g.*, *Usher v. Ercole*, 710 F.Supp.2d 287, 305-09 (E.D.N.Y. 2010) (failure to redact "damaging[ ]" portions of an exhibit was deficient performance); *Earls v. McCaughtry*,

379 F.3d 489, 494 (7th Cir. 2004) (same).[13]

It is no surprise, therefore, that the State effectively conceded deficient performance before the Appellate Division. *See* A1135 (never challenging Mr. Carr's argument that these redaction blunders constituted deficient performance and instead "conceding that [the] minutes should have been redacted prior to being introduced into evidence"). No "fairminded jurist" could find that allowing the jury to read a judge's damning declarations of guilt and dangerousness was reasonable. *Hinton*, 571 U.S at 264, 273; *Harrington*, 562 U.S. at 102.

## C. Counsel's grave blunders worked serious prejudice to the defense.

### 1. De novo review applies.

The Appellate Division held that Mr. Carr could not show that counsel's blunders "deprived [him] of a fair trial or affected the outcome of the case. *Specifically*,

---

[13] The Appellate Division decision's passing reference to the need for a state-evidentiary hearing (C.P.L. § 440.10) cannot reasonably be interpreted to apply to counsel's failure-to-redact blunders as opposed to the other blunders Mr. Carr alleged on appeal. *See* A1064-73 (Mr. Carr argued that counsel was ineffective for, among other things, failing to preclude hearsay, object to certain summation comments, and advocate for his client at sentencing); App. Div. Decision: A4 (the "ineffective assistance of counsel claims are unreviewable on direct appeal because they involve matters not reflected in, or fully explained by, the record").

This record conclusively demonstrates that counsel's redaction blunders were the result of carelessness and not reasonable strategic calls. Thus, the State cannot—and has not—argued that an evidentiary hearing under C.P.L. § 440.10 was required to determine whether counsel had a reasonable strategic basis for allowing the jury to review the unredacted transcripts. *E.g.*, *People v. Shutsha,* 151 A.D.3d 657, 658 (1st Dept. 2017) (ineffective-assistance claim must be raised on direct appeal where the direct-appellate record is sufficient to permit review); C.P.L. § 440.10(2)(b) (barring a post-conviction hearing and instead requiring direct-appellate review where, as here, "sufficient facts appear on the record" to "permit adequate review"); *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001); *see also* Carr App. Div. Reply Brief A1162 n. 4 (explaining that counsel was deceased by the time a complete record was provided to assigned appellate counsel). Instead, the State conceded that the jury never should have seen these unredacted transcripts. A1135. As there is no plausible theory under which a state-post-conviction hearing would be required here, the only reasonable reading of the Appellate Division decision is that Mr. Carr's *other* ineffective-assistance claims required an evidentiary hearing. *See* C.P.L. § 440.10(2)(b).

defendant has not shown that the verdict *would have been different* even if counsel had made all the objections defendant now faults him for failing to make, and if all of those objections had been successful." A4-5 (emphasis added). The Appellate Division's insistence that Mr. Carr establish that the "verdict would have been different" was "contrary to" *Strickland*'s clearly-established prejudice standard, thus requiring de novo review of the prejudice issue. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405-06.

The *Williams* Court held that it is "contrary to" *Strickland* to require a defendant to show that but for the deficient performance, the verdict "would have been different." *Williams*, 529 U.S. at 405-06 (citation omitted); *Strickland*, 466 U.S. at 693-94 ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"; instead, the "reasonable probability" standard only requires a defendant to show that counsel's blunder "undermine[s] confidence in the outcome."). A "state-court decision," *Williams* held, is "contrary to our clearly established precedent if [it] applies a rule that contradicts the governing law set forth in our cases." *Id.* at 405. In turn, *Williams* posited a *Strickland* "example" involving this precise context:

> If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding *would have been different*, that decision would be [contrary to] our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that the result of the proceeding would have been different."

529 U.S. at 405-06 (emphasis added) (quoting *Strickland*, 466 U.S. at 694).

As *Williams* confirms, requiring the accused to show that but for counsel's deficient performance, the result "would have been different"—as the Appellate Division did here—"reflects a patent misunderstanding of *Strickland*'s prejudice standard" and "ask[s] too much" of the defendant. *Jones v. Calloway*, 842 F.3d 454, 464-65 (7th Cir. 2016). "This is not a mere detail or a quibble over word-smithing. It's a substantive point, and one that both the Supreme Court and we have made before." *Id.* (citing *Williams*, 529 U.S. at 405-06 and *Mosley v. Atchison*, 689 F.3d 838, 850 (7th Cir. 2014)); *see also Porter v. McCollum,* 558 U.S. 30, 44 (2009) (per curiam) (quoting *Strickland,* 466 U.S. at 693-94); *Wilson v. Mazzuca,* 570 F.3d 490, 507 (2d Cir. 2009) ("[T]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different.") (quoting *United States v. Dominguez Benitez,* 542 U.S. 74, 83 n. 9 (2004)).

As the Appellate Division's "would-have-been-different" standard was contrary to *Strickland*'s clearly-established prejudice standard, de novo review applies. A4-5; *Williams*, 529 U.S. at 405-06; *Strickland*, 466 U.S. at 693-94. And as shown below, counsel's egregious failure to redact the plea transcripts undermines confidence in the trial's outcome, thus satisfying *Strickland*'s prejudice standard. *Strickland*, 466 U.S. at 693-94.

### 2.   Under either de novo or deferential review, Mr. Carr can establish prejudice.

Either under de novo or deferential review, the writ should issue. "Fairminded jurists could" *only* conclude that these judicial declarations of guilt and

dangerousness undermine confidence in the verdict and "call the fairness of the trial into doubt." *Harrington v. Richter*, 562 U.S. 86, 110 (2011); *Strickland*, 466 U.S. at 694.

### i. These judicial declarations of guilt were gravely prejudicial.

It is difficult to imagine exhibits more damaging than transcripts containing a judge's declaration that the defendant is guilty of the charged offenses and is dangerous. A23-24, A48-49. These unredacted transcripts effectively amounted to a directed verdict from an inherently trustworthy individual: a judge. *See Parker v. Gladden*, 385 U.S. 363, 363, 365 (1966) (rejecting the State's argument that a bailiff's statement to the jury that defendant was "wicked" and "guilty" did not deprive him of a fair trial because the "official character of the bailiff—as an officer of the court as well as of the State—beyond question carries great weight with a jury."). The "official character" of the judge—as the *leader* of the court and the most trusted participant in our system—"beyond question carries great weight with a jury." *Id.*

*Strickland*'s holding was tailor-made for this scenario. "Some errors," *Strickland* held, "will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture[.]" 466 U.S. at 695-96. Counsel's "pervasive" errors here "altered the entire evidentiary picture" as they effectively instructed the jury to ignore the serious weaknesses in the State's case because a trusted judge had already determined Mr. Carr's guilt. "[I]t would be blinking reality not to recognize the extreme prejudice inherent" in these judicial declarations of guilt and dangerousness. *Parker*, 385 U.S. at 365.

These judicial declarations were uniquely prejudicial because they infected the heart of the defense theory: the cooperators were lying to save themselves and each other from prison time. *E.g.,* Defense Summation: A889-904, A910. In assessing this defense, the cooperating transcripts were pivotal since they outlined the benefit that the criminal cooperators received in exchange for their testimony. A6-66. But instead of focusing exclusively on the critical exculpatory evidence contained within the transcripts, the jury read judicial declarations of guilt and dangerousness. Counsel's blunders effectively deleted a powerful defense from this case and thus "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *Earls*, 379 F.3d at 496 (finding prejudice where jury reviewed a "pivotal" but unredacted exhibit that contained inadmissible expert determinations about complainant's credibility).

The unique circumstances here reinforce the fundamental unfairness. After defense counsel implored the jury to review the unredacted plea transcripts during summation, the jury's first note requested those very transcripts. A893-95, A900-01, A1206. Then, less than two hours after receiving them, the jury reached a verdict. A966, A1208. These judicial declarations infected the jury at the most prejudicial moment: during deliberations just before the verdict. *E.g. Earls*, 379 F.3d at 496 (counsel's failure to redact was prejudicial because the jury requested the unredacted exhibits during deliberations).

The State claimed before the Appellate Division that there was "no basis to believe the pleading court had any personal knowledge of defendant's guilt," analogizing the

judge's declaration to an anonymous 911 call accusing someone of a shooting without explaining the basis for that allegation. State's App. Div. Brief: A1111-12 (citing *People v. Twanek Cummings*, 31 N.Y.3d 204, 207 (2018) (court held that an anonymous post-shooting declaration during a 911 call that "it was Twanek" was inadmissible hearsay because there was no apparent foundation for the statement). This argument reflects an unreasonable understanding of the judicial role. Jurors, no doubt, correctly presume judges know the facts of the cases before them and don't make baseless and arbitrary claims about a defendant's guilt of murder. Indeed, it would have been perfectly sensible for the jury to conclude that a judge authorizing these very favorable deals knew the facts of this case and did not randomly accuse Mr. Carr of murder. Similarly, the jury likely correctly assumed that judges *must* have information sufficient to decide whether accepting any plea is warranted. Any suggestion otherwise is not grounded in common sense or reality.

At a minimum, even if it were *theoretically* possible that the jury shared the State's strange view of judges, that would not matter. The *Strickland* prejudice standard does not require that defendant prove prejudice beyond a reasonable doubt, only that the attorney's blunders undermine confidence in the outcome. *Strickland*, 466 U.S. at 693-94. No reasonable jurist could conclude—with confidence—that the jury adopted the prosecution's odd understanding of the judicial function. 28 U.S.C. § 2254(d)(1).

### ii. The State's case was underwhelming and had serious problems.

These devastating blunders were all the more prejudicial because the State's case

was underwhelming and had serious problems. *E.g.*, *Strickland*, 466 U.S. at 696 ("A verdict or conclusion only weakly supported by the record is more likely to have been affected by [counsel's] errors."); *Gersten v. Senkowski*, 426 F.3d 588, 613, 614 (2d Cir. 2005) (finding prejudice in light of the "underwhelming" evidence).

### a. The Gunshot-Residue Evidence

Critically, the forensic evidence confirmed *innocence*. Although gunshot residue would have likely been on the hoodie had Mr. Carr been the shooter, none was found on the tape lifts performed on the sweatshirt's sleeves. Fox: A574 ("Q. [A]m I correct that very often the shooter, the person shooting the weapon will then end up getting gunshot residue most commonly on the shooting hand or arm? A. You would get gases from the firearm on your hand, yes. Q. Which would be, that's like a form of residue? A. Yes."); Fox: A578 ("Gases are coming out of the gun, anywhere where there's a whole in the gun the gases [and residue] would be coming out . . ."); Fox: A581; Scott-Rowe: A799-803 (microscope analysis of the tape lifts confirmed that there was no gunshot residue on the sleeves and the entire hoodie). This gunshot-residue analysis was critical evidence of innocence.

The forensic analyst's testimony further confirmed the point. The analyst twisted herself in knots trying to explain her decision not to perform additional chemical testing after the tape lifts produced a negative result. She nonsensically testified that the NYPD does not test for gunshot-residue chemicals because gunshot residue contains "nitrites," which could be found in non-gunshot-residue materials, such as cured meat. A801. But the analyst conceded on cross-examination that gunshot

residue contains a combination of barium, antimony, and lead, which are not collectively found in common substances. A811-12. Thus, the persuasive defense theory went, the *real* reason the State declined to perform further gunshot residue testing was because it would exonerate Mr. Carr and create "reasonable doubt that can fill this courtroom. [Thus,] they didn't want it done." Defense Summation: A907-08.

### b. The cooperators had serious credibility problems.

The drug dealers and violent felons who testified against Mr. Carr did not nullify the prejudicial impact of counsel's devastating blunders. Those witnesses had grave credibility problems as they only testified against Mr. Carr in exchange for a windfall: the nullification of at least 65 years of collective prison exposure and the evasion of felony records. *Banks v. Dretke,* 540 U.S. 668, 702 (2004) ("This Court has long recognized the 'serious questions of credibility' informers pose.") (quoting *On Lee v. United States*, 343 U.S. 747, 757 (1952) and parenthetically citing and quoting Judge Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1385 (1996) ("Jurors suspect [informants'] motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable . . . .")).

Not only were these family members accusing Mr. Carr to save themselves, they were also testifying to save each other. Santiago testified that she only decided to accuse Mr. Carr of murder months after the shooting in order to help her son avoid prison time. A771, A784. And on the very day she agreed to cooperate, her son was

released from jail. A779. The State further sealed the deal on Santiago's testimony by tying her cooperation to her son's liberty in his plea deal. A44-46. There was a significant probability that the jury would have concluded, had they not been tainted by the unredacted transcripts, that a mother would lie to save her son from serious prison time.

The cooperators' testimony was also uniquely suspect because they never accused anyone until they were arrested ten months after the November 2009 shooting. *See United States v. Reyes*, 18 F.3d 65, 72 (2d Cir. 1994) (explaining the common-sense point that when a cooperator accuses someone before their motive to lie sets in, their credibility is greater). Then, in seeking to trade accusations for leniency, they chose an obvious target: the very man they "already knew" was in custody for the murder. Defense Summation: A894-95. This drug-dealing family thus did exactly what lying cooperators would do—conveniently blame the same man the State had already arrested.

Beyond their strong motive to lie, the witness' implausible accounts injected grave doubts into this case. The jury had excellent reasons to doubt whether three individuals could reliably identify a hooded individual from over 100-feet away at night after seeing him for a fleeting moment.[14] The scientific literature confirms that

---

[14] *E.g.*, *United States v. Baylor*, 2011 W.L. 5910061, at *7 (E.D. Va. Nov. 28, 2011) ("The presence of a hat . . . would obscure distinctive individual features. This factor is within the jury's common knowledge. If a [suspect] is wearing a hat, the witness is missing a number of critical identification cues such as hair color, hair texture, hair style, hair line, and even head size and shape. It goes without saying that any concealing of physical characteristics—and especially facial features—would serve to decrease a witness's ability to make an accurate identification.").

common sense.[15] It was at least probable that the jury concluded that the cooperators' unbelievable "identifications" were not based on the *truth*, but based on their sweetheart deals.

The cooperators' accounts did not check out either. They obviously lied when they claimed that they had not spoken to each other about their deals and this shooting. *E.g.*, A626-27, A661. It strains credulity to contend that a mother, her son, and her nephew never discussed these monumental developments with each other, especially since they were shot at together, indicted together, and all agreed to testify in the same trial. The cooperators' false testimony confirmed they were feigning non-coordination to hide the fact that they had all adopted the same false story to save themselves from prison.

The cousins' implausible "Champion" brand testimony added even more reasonable doubt. Ortiz and Rivas claimed that, from their distant vantage point, they could identify the hoodie as a "Champion" hoodie—an impossible feat that they never explained with any clarity. Ortiz did not even try to explain this unbelievable

---

[15] Franklin & Greenstein, *A Brief Guide to Factors That Commonly Influence Identification and Memory of Criminal Events*, 85 N.Y. State Bar J. 10, 15 (March/April 2013) ("Perpetrators often wear hats, hoodies, sunglasses, or bandanas, covering important features that witnesses might have used to identify them. Correct IDs are reduced by more than half as a result. And, as so often happens, because the impulse to choose remains high, false IDs increase by quite a bit."); Beety, *What the Brain Saw: The Case of Trayvon Martin and the Need for Eyewitness Identification Reform*, 90 Denv. U.L. Rev. 331, 336 (2012) (explaining that hoodies limit a witness' ability to observe because "[r]esearch shows that hair and even the hairline are important indicators of identification, and the covering of hair influences the accuracy of identification") (citing Cutler, *A Sample of Witness, Crime, and Perpetrator Characteristics Affecting Eyewitness Identification Accuracy*, 4 Cardozo Pub. L. Poly. & Ethics J. 327, 332-33 (2006)); Hagen & Yang, *Criminal Defendants Have a Due Process Right to an Expert on Eyewitness Reliability: Why the Court Was Wrong in Perry v. New Hampshire*, 26 S. Cal. Interdisc. L.J. 47, 52 (2016).

testimony. Rivas tried, but his weak attempt only confirmed he shouldn't be trusted: "you know what, [he had] a, like Champion hoodie, it was all black. . . . Yeah, like he had, like a hoodie with a cone top." A729. Even the prosecutor admitted she did not know what Rivas was talking about, stating in summation that "Angel told you Champion hoodies are different than other hoodies. I wouldn't know the difference, but according to [Rivas], they have some kind of difference on the hood of the hoody, which is why he says he knows what it is." A922. The contrary theory—the cousins were reconciling their "Champion" account with the evidence to secure their deal— was far-more plausible than the prosecutor's theory that the cousins could magically identify hoodie brands from 100-feet away at night. A922.

### c. The State had no motive evidence.

The State's case also had serious holes because the State presented no motive evidence whatsoever. *House v. Bell*, 547 U.S. 518, 540 (2006) ("When identity is in question, motive is key."). Instead, the State presented "a weak and unlikely theory" that a 17-year-old with no prior record came up to a group of drug dealers and shot them for no reason whatsoever. *Mendez v. Artuz*, 303 F.3d 411, 413 (2d Cir. 2002). On the other hand, there were numerous other people who had a motive to attack a group of drug dealers, including, most obviously, rival drug dealers. That counter-theory— which the police did not even bother to investigate—was far-more plausible than the dubious theory the State presented to the jury. *Kyles v. Whitley*, 514 U.S. 419, 445-46 & 446 n. 15 (1995) (a sloppy or lazy investigation undermines the reliability of the investigation's results).

### d. Evidence that Mr. Carr ran from the sound of gunfire and discarded a hoodie had virtually no probative value.

Mr. Carr's running a block from the scene after shots were fired does not somehow undermine the prejudice worked by counsel's egregious error. That speculative evidence had virtually no probative value since *innocent* people run upon hearing gunfire.

As for Mr. Carr's discarding of the hoodie in the schoolyard, that too was obviously susceptible to an innocent interpretation. An innocent African-American teenager could very well discard a hoodie—especially after gunshots are fired nearby—because he knows that attire attracts police attention. *See, e.g., Floyd v. City of New York*, 959 F.Supp.2d 540, 588 (S.D.N.Y. 2013) ("'[W]e know that daring to wear jeans and a hooded sweatshirt too often means that the police or other citizens are judged to be reasonable in fearing you.'") (quoting Yankah, Op-Ed., The Truth About Trayvon, N.Y. Times, July 16, 2013, at A23).[16] An innocent person would also discard a hoodie because a hoodie would slow one down when running from deadly gunfire.[17]

In any event, the speculative hoodie-discarding evidence had no inculpatory value given the *objective* scientific proof that there was no gunshot residue on the hoodie.

---

[16] *See also, e.g.*, Beety, *above*, at 335-36; Stuart, *Becoming "Copwise": Policing, Culture, and the Collateral Consequences of Street-Level Criminalization*, 50 Law & Soc'y Rev. 279, 309 (2016).

[17] And of course, the fact that Mr. Carr was in a densely-populated urban location wearing common attire—a dark hoodie—is also virtually irrelevant. There could have been scores of individuals wearing a dark hoodie that night around the vicinity of the shooting. Indeed, the surveillance footage of the street/sidewalk (outside the scene of the shooting) indicated numerous pedestrians wearing that attire in the minutes preceding the shooting. *See* Ex. 66.

### iii. The judicial declarations of guilt/dangerousness rendered this proceeding fundamentally unfair.

As shown above, there was reasonable doubt all over this case. But the jury could not fairly and rationally assess the evidence because counsel senselessly allowed the jury to read—moments before reaching a verdict—a judge's declaration that Mr. Carr was dangerous and *guilty*. A23-24, A48-49. The judge's prejudicial declarations effectively fixed the serious problems with the State's underwhelming case. Counsel's blunders had "a pervasive effect on the inferences to be drawn from the evidence" and changed "the entire evidentiary picture." *Strickland* 466 U.S. at 695-96.

Counsel's blunders thus undermine confidence in the verdict, *Strickland*, 466 U.S. at 693-94, and were so "fundamental as to call the fairness of the trial into doubt." *Harrington*, 562 U.S. at 110. A reasonable jurist could not find otherwise. *Id.* at 102.

### D. The writ should issue.

The writ should issue so Mr. Carr can have a fair trial with effective counsel. 28 U.S.C. § 2254(d)(1). Mr. Carr is not asking for dismissal, only the opportunity to have a jury decide this case without first reading a judge's declaration that he is guilty and dangerous. Both the Sixth Amendment and AEDPA mandate that Mr. Carr have that opportunity. If a defendant is not entitled to a retrial when his own lawyer allows the jury to read a judge's devastating declarations of guilt and dangerousness, the Sixth Amendment is in serious trouble.[18]

---

[18] Mr. Carr exhausted this Sixth Amendment claim because he argued, at every level of the state-appellate proceedings, that counsel was ineffective under the Sixth Amendment for failing to redact the plea transcripts. 28 U.S.C. § 2254 (b)(1)(A),(c); *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

This is also Mr. Carr's first habeas petition challenging the instant convictions.

## CONCLUSION

The petition for a writ of habeas corpus should be granted.


Respectfully submitted,


Robert S. Dean (RD-0772)
*Attorney for Petitioner*
Center for Appellate Litigation
120 Wall Street, 28th Floor
New York, New York 10005
(212) 577-2523
rdean@cfal.org

BY:

Matthew Bova (5073135)
*Of Counsel*
mbova@cfal.org


September 22, 2020